IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| BEVERLY WOODBERRY,<br>    **Plaintiff** | )<br>)<br>) |
| V. | )   CIVIL ACTION NO.7:06-CV-206-O KA<br>) |
| CITY OF WICHITA FALLS, TEXAS,<br>    **Defendant** | ) |

MEMORANDUM AND ORDER

Nature of Case

This is a racial discrimination/retaliation case brought by Plaintiff Beverly Woodberry ("Woodberry") a 28 year old African-American female against the City of Wichita Falls, Texas under Title VII, 42 U.S.C. § 2000e, et seq. asserting that she was fired as a direct result of racial animus within the City's police department.

Procedural Status

Now before the Court is the Motion for Summary Judgment filed by the City of Wichita Falls ("City") on August 1, 2008 (Docket No. 22) and referred to the undersigned magistrate judge by Order dated August 28, 2008 (Docket No. 29). In response to Woodberry's Response, Brief, and Affidavit in opposition to the City's Motion, the City filed a Reply accompanied by a Motion to Strike Plaintiff's Summary Judgement Proof (Docket No.39).

Factual Scene

On or about December 13, 2004, Beverly Woodberry made application to be a police officer with the City police department. On December 28, 2004 she was hired by Chief Dennis Bachman on a "pre-employment condition on the hiring process" for the position of a police officer, the conditions being that she pass certain polygraph, physical and mental tests and satisfactorily complete a "mini-academy" course covering particular aspects of law enforcement conditions particular to the City. During the January period, she passed the polygraph, mental and most of the physical tests and on February 7, 2005 she was appointed by Chief Bachman as a police officer with the City Police Department. With two other applicants, Thomas Jones, a Hispanic male, and Keith Williams, a white male, she waited for the mini-academy to start. The City was waiting for more applicants before starting the mini-academy. During this time, she took more training that included situational exercises and physical training. And she worked some administrative type jobs, including the physical moving of the quartermaster's office. During this interim period, certain events occurred that ultimately led to her being fired on April 12, 2005. It is the nature and character of these events that form the basis of Woodberry's complaints.

1

## The Events

To understand the stated positions of the parties, the Court has identify the seminal events that motivated certain actions of the parties. Stripped of the hyperbole and disputes over wording by the participants and their counsel, there are eight identified events that form the factual basis for Woodberry's claims of racial discrimination and the City's claimed non-discriminatory justification for her termination:

1. <u>Training Event</u>: While participating in a training exercise involving a simulated traffic stop, Woodberry as a role player in the stop scenario was forcible pulled from the automobile by a white officer and pushed to the ground. Woodberry claims that the white officer addressed her saying "I'm going to fucking kill you..." then using the "N" word or "nig", although she admitted that the protective helmets on herself and the officer prevented her from hearing his words. She said she later learned from Jones that during the throw the officer had used the word "nig", stopping himself short of the word "nigger" in referring to her. Her hearing and her memory of these events is contradictory in several of her sworn statements.
2. <u>Hallway Event</u>: Several days after the Training Event, at the police station while on her way down the hallway she heard two white unidentified officers use the phrase "Is that what we're hiring?" followed by the "N" word that both seemed to be directed at her. She could not identify the offending officers and no there is no corroboration .
3. <u>Water Bill Event</u>: While talking to a black clerk at the City Water Department window while paying her bill, she asked the clerk about a church where two other black police officers attended. She says that an unidentified white man standing in line butted in and said to her something to the effect that "(we or) they don't hire your kind." The clerk later corroborates this event.
4. <u>Mailbox Event</u>: She discovered several letters in her mail box addressed to their box without addressee name or return address. The letters stated "I know you are here" or "I see you." These turn out to have been placed there by her child.
5. <u>TV /Lights Event</u>: She said that on several occasions the lights and a tv in her house were turned on unexplainably after they had turned them off when leaving. The cause or perpetrators of these events is never determined.
6. <u>Mask Event</u>: She discovered a black ski mask outside her bath window at her house. The source of this event is undetermined.
7. <u>Investigation Event</u>: At the direction of the Chief, an internal affairs officer made an investigation of Woodberry's claims of racial bias within the department. She claims the investigation was intended to discredit her and her claims of racial bias. The Investigating officer's report to the Chief of Police was in writing and the interviews of Woodberry and the other witnesses were transcribed. Woodberry's interview was videotaped and reviewed by the Court.
8. <u>Termination Event</u>: She was called into the Chief's office and informed by him that her employment was terminated because of her lack of truthfulness during an investigation of her complaints about department racism and because of her unexplained absence from a duty post.

## Timing and Sequence of Events

Counseling Session: On March 10 after about one month of training, Woodberry was called in to talk to Support Captain Manuel Borrego and Training Sergeant Jack Coltrain for counseling about her lack of motivation and not putting forth any effort during her training including the physical fitness training which included a 1 ½ mile run. They also inquired regarding her perceived desire to move back to Houston. During that session and in response to their questions, she told them about the Training Event and the Hallway Event. Captain Borrego requested that she submit a written memorandum regarding the events. She did so that day describing also the TV/ Lights Event and the Water Bill Event. App. p. 194. Sergeant Coltrain submitted his written memorandum of their meeting that day as well. App. pp. 195-197. Borrego sent his own memorandum with those of Woodberry and Coltrain to the Chief recommending that the issue be investigated. App. pp. 192-193. The Chief promptly assigned Lieutenant Lillie of the Office of Professional Conduct to start an internal affairs investigation of the Events.

Racism Investigation;. On March 11 the morning following the counseling session, Lillie started his investigation with the taking of a sworn statement from Woodberry during which she related her perception of the Training, Hallway, TV/Lights and Water Bill, and Mailing Events and she described the Mask Event for the first time. App. pp. 72-91. Lillie took the sworn statements of Jones and Williams that same day. App. pp. 118-29. Lillie followed up in his investigation by interviewing the training officer involved in the Training Event, the Water Department clerk involved in the Water Bill Event, the real estate agent that leased the house to Woodberry and her assistant who knew about the change of locks relating to the still unexplainable TV/Lights Event, two clerks at the two motels where Woodberry and her family stayed back on February 5-6 &7-9 (perhaps related to the TV/Lights Event). App. pp. 210-14. By his March 18 report to Chief Bachman (App. pp. 206-17) Lillie made the finding that Woodberry's complaints about racial slurs, derogatory comments and harassment by officers of the police department were "unfounded." App. pp. 215-17. Lillie also stated that he had determined that Woodberry had given conflicting statements concerning what she heard or did not hear during the Training Event, that the facts did not support the TV/Lights Event or the Mask Event as being connected to the police department. App. p. 215. Woodberry was not informed of the results of Lillie's investigation at that time.

Absenteeism Investigation. On April 7, Lillie was informed of a new event regarding the unexplained absence of Woodberry from her assigned duty station at the quartermaster's office. Lillie investigated the event and prepared a report to Chief Bachman on April 12 relating that Woodberry was not at her assigned duty post for two hours. Chief Bachman's administrative assistant Arlene Eaton was the employee who had reported the absence of Woodbury from her quartermasters office duty post and on April 12 had given a memorandum to that effect to Chief Bachman at his request. App. P. 201.

Termination. On April 12, Woodberry was called into Chief Bachman's office during which Woodberry was informed of the results of Lillie's two investigations and was informed that her employment with the department was terminated because of her perceived untruthfulness and the reported absence from her duty post. Bachman Affidavit, App. pp.108-132.

## Summary Judgment Standards

The standards for resolution of summary judgments have been well articulated by the District Courts in this District and need not be repeated here. See *Vrzalik v. Potter*, 2008 WL 2139529, 2008

3

U. S. Dist. LEXIS 40913 (N.D. Tex. 2008) and cases cited therein.

## Plaintiff's Discrimination Claims

Woodberry filed an EEOC complaint on November 19, 2004. On September 15, 2005, the EEOC issued a right-to-sue letter. Thereafter, she filed her complaint in this case on December 18, 2006. By her Amended Complaint (Docket No.4), her current pleading, Woodberry contends that the City discriminated against her due to her race in violation of Title VII by maintaining a hostile workplace, by treating her disparately, and/or terminating her employment because of race and in retaliation for her pursuing a hostile workplace and/or disparate treatment racial discrimination claim. Her pleading also tangentially alleges a sex discrimination claim. The City moves for summary judgement on all of Woodberry's discrimination claims.

## Legal Standards for Discrimination Claims

Under Title VII, an employer cannot discharge any person because of such person's race. 42 U.S.C. §2000e-2(a)(1) *et seq*. Thus, in the employment context, the Title VII inquiry is whether the employer intentionally discriminated against the employee because of race. In the Summary Judgment context the *McDonnell-Douglas*[1] case establishes a burden-shifting framework for analysis of Title VII hostile workplace, disparate treatment and retaliation discrimination cases. To prevail on a Title VII claim, an employee has the initial burden to demonstrate a *prima facia* case of discrimination. Once a *prima facia* case has been presented, the burden shifts to the employer to articulate and produce evidence of a legitimate, non-discriminatory reason for its termination decision. If the employer meets its burden of production on this issue, then the burden shifts to the employee to offer sufficient evidence to create a genuine issue of material fact either 1) that the employer's reason is not true, but is instead a pretext for discrimination (pretext alternative); or 2) that the employer's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the employees's protected characteristic (mixed-motive alternative). Under the pretext alternative, the employee bears the burden on the ultimate issue of discriminatory intent. However, if the employee demonstrates under the mixed motive alternative that race was a motivating factor in the employment action decision, the burden shifts back onto the employer to prove that the same adverse employment decision would have been made regardless of discriminatory animus. *Vrzalik*, supra, citing *Keegan v. Majesco Software, Inc.* 407 F. 3d 332 (5th Cir. 2005). This burden shifting framework is applicable to both race discrimination and hostile workplace claims. *Thomas v. TPI Staffing*, 191 Fed. Appx. 287, 2005 WL 1562462 2006 U. S. App. LEXIS 18261 (S.D. Tex. 2005); *Torrez v. Milk Products, L. P.*, 402 F. Supp. 2d 773 2005 U. S. Dist. LEXIS 10036 (W. D. Tex. 2005).

## Hostile Work Environment Claim

To establish a *prima facia* case of hostile work environment, an employee must show that: 1. she belongs to a protected group; 2. she was subjected to unwelcome harassment; 3. The harassment was based upon the employee's inclusion in the protected group; 4. The harassment affected a term, condition, or privilege of her employment, and 5. The employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Celestine v.*

---

[1] McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)

4

*Petroleos de Venez, SA*, 266 F. 3d 343, 353 (5th Cir. 2001). As an African-American and as a woman, Woodberry is a member of a protected class. Woodberry's workplace was the police department of the City. The only workplace harassment events identified by Woodberry that arose in the workplace were the Training and Hallway events. There is no summary judgment proof that the City knew of these incidents prior to her relating these incidents during her counseling session with Borrego. After her report of these events, an investigation was properly and promptly initiated by the Chief of Police.

Hallway Event: Since neither she nor Investigator Lillie could identify the hallway speakers, Woodberry makes no showing that the City was at fault for not taking a remedial action.

Training Event: During his investigation Lillie apparently identified the training officer, interviewed him, and received a denial by him of the use of the "N" word. App. p.214. I find that the use of force in the training incident was appropriate to the traffic stop scenario being acted out by the training officer. The summary judgment evidence reflects that there was ambiguity as to whether Woodbury actually heard the training officer say anything inappropriate to the training scenario as it unfolded. Her own statements as to what she heard or was told to her by whom are in conflict. At the time of the event, she did not perceive the event as hostile to her race. Only later after someone else may (or may not) have related the comments to her did she then perceive the event as being race related.

The Other Events: The Water Bill Event was not in her workplace.[2] The TV/Lights and Mask Events were not connected to her workplace by any evidence.[3] The Mail Box Event was shown to be unrelated to her workplace.[4]

I find that Woodberry has wholly failed to establish a hostile work environment claim since the two events did not affect a term, condition or privilege of her employment, the City did not know and could not have known of the events until Woodberry reported them, and the City did not fail to take timely action with regard to those events.

While a single egregious event may, in and of itself, create a hostile workplace sufficient to give rise to a cognizable Title VII claim[5], I conclude that these two did not.[6]

## Disparate Treatment Claim

To prevail on a disparate treatment claim, an employee must establish a *prima facia* showing that 1) she belongs to a protected class, 2) she was subjected to an adverse employment action differently from others not in the protected class. Analysis of this issue necessarily requires a comparison to "others." The only disparate treatment raised by Woodberry with respect to her

---

[2] It occurred at the Water Department window in the City Administration Building, not in proximity to the police building or training facility.

[3] Both events occurred at her home and there was no showing of any connection to her workplace.

[4] The mail items were made by Woodberry's own daughter. App.p.95.

[5] See Faragher v. City of Boca Raton, 524 U. S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

[6] See Pickens v. Shell Technology Ventures, Inc., 118 Fed. Appx. 842, 850 2004 U. S. App. 27170 (5th Cir. 2004)

5

employment conditions was that she (an African-American and a female) was assigned to administrative duties (she calls them "menial tasks") while other trainees (Hispanic and Anglo males) were engaged in other activities at other places and that she was fired but they were not. With respect to the work assignments, Woodberry makes no showing whatsoever that her duty assignments were racially or sex based. Similarly, she makes no showing that males or persons of other races were not or would not be fired under similar circumstances for untruthfulness or absence from assigned post.

Even assuming that Woodberry has made a *prima facia* showing that the termination of her employment was different from others (males or non-blacks), the burden shifts to the City to produce evidence that the termination of her employment was for "a legitimate, nondiscriminatory reason." *St, Mary's Honor Center v. Hicks*, 509 U. S. 502, 506-07, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The City has discharged that burden. The reason proffered by the City for terminating Woodberry's employment was twofold: 1. Because she was untruthful in her statements supporting her claim of racial bias within the department, and 2. Because she was not at her duty post when she should have been.[7]

Woodberry claims that these reasons proffered by the City were pretexts because she was <u>not</u> untruthful and was <u>not</u> absent from her post. Much of the summary judgment proof and the parties arguments were directed to proving who said what and who heard what during the Events. The City claims its summary judgment evidence establishes that Woodberry was lying or shading the truth when describing her racial bias claims to Borrego, Coltrain and later to Lillie. Woodberry claims her summary judgment evidence shows that she was telling the truth to Borrego, Coltrain and Lillie about the racial comments and actions at the Training and Hallway Events and they misunderstood and distorted what she told them and they white washed the matters in their reports to Chief Bachman. She further claims that Lille's investigation turned from investigating racial bias into a witch hunt against her. The summary judgment evidence of the parties is irreconcilable as to Woodbury's truthfulness or untruthfulness. Likewise, there is direct conflict in the summary judgment evidence as to whether Woodberry wrongfully abandoned her duty post, or was merely in the bathroom when the Chief's Administrative Assistant went to the Quartermaster's office to look for her.

However, the summary judgment evidence is clear that Chief Bachman had probable cause to believe that Woodberry had committed both conducts during her employment with the City. Either of these conducts would be sufficient grounds for termination of Woodbury's employment. Bachman had before him Lille's March 18 Investigative report. App. pp.206-217. Bachman had before him Lille's second report of April 12. App. pp.198-202. Either of these grounds for termination were non-discriminatory as to race or sex. To negate the implications of the Lillie reports to Bachman, Woodberry asserts that the reports themselves were motivated by racial bias. I find from a review of the reports and of the video tapes and transcripts of Lillie's interviews of Woodberry and the witnesses that Lillie made an appropriate investigation in a prompt and appropriate manner using appropriate investigatory techniques. There is nothing in Lillie's methodology or reporting that raises a suspicion as to his investigatory motivation. Lillie's investigation did turn from just following up on Woodbury's complaint to examining the conduct of Woodberry as well. I conclude that Woodberry has wholly failed to raise with summary judgment proof a genuine question that Lillie's investigation or Chief Bachman's reliance thereon was racially motivated.

---

[7] Bachman Affidavit, APP. p 111.

## Retaliation Claim

Woodberry claims that she was fired because she made a racial bias claim about the department to supervisors within the department and then they did a hatchet job to get rid of her. In support for this claim she asks the Court to consider the whole course of conduct of the police department from her hiring through the Training and Hallway Events, from the counseling meeting with Borrego and Coltrain though the investigation by Lillie, culminating in the meeting with Chief Bachman when she was fired. She claims that all this collective conduct reflects the department's racial animus. In support she asks this court to consider the totality of the circumstances and totality of the conduct rather than critically examine each one of the events. Considering the totality of Woodberry's summary judgment proof both as to the circumstances and conduct during the individual events and considering the conduct of members of the department as a whole, I find and conclude that the summary judgment proof does not raise a genuine issue of fact that either reason given for the termination of her employment was pretext or that the termination was otherwise motivated by race.

Even if Woodberry had established a *prima facie* case of discrimination, which I conclude she did not, she has not provided sufficient evidence to rebut the nondiscriminatory reason for her termination. *Wagoner v. City of Garland, Texas*, 987 F.2d 1160, 1165 (5th Cir. 1993)

Accordingly, I recommend to the District Court that the City's Motion for Summary Judgment be granted as to the whole case and that final judgment be entered that Plaintiff take nothing. By reason of the foregoing findings and recommendation, I find that Defendant's Motion to Strike Portions of Plaintiff's Summary Judgment Proof is moot.

It is so Ordered, this 14th day of October, 2008.

Robert K. Roach
United States Magistrate Judge